UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| KELLIE E. SEEGER, | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 4:12 CV 856 DDN ) |
| CAROLYN W. COLVIN,[1] Commissioner of Social Security, | ) ) ) ) |
| Defendant. | ) |

## MEMORANDUM

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the applications of plaintiff Kellie E. Seeger for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 401, et seq., and for supplemental security income under Title XVI of that Act, 42 U.S.C. § 1381, et seq. The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). (Doc. 7.) For the reasons set forth below, the decision of the Administrative Law Judge is affirmed.

## I.  BACKGROUND

Plaintiff Kellie E. Seeger, born March 17, 1981, filed applications for Title II and Title XVI benefits on August 7, 2009. (Tr. 147-54.) She alleged an onset date of disability of April 14, 2009, due to herniated discs, spinal stenosis, hypertrophy, depression and anxiety. (Tr. 177-84.) Plaintiff's applications were denied initially on October 19, 2009, and she requested a hearing before an ALJ. (Tr. 82-91.)

On November 8, 2010, following a hearing, the ALJ found plaintiff not disabled. (Tr. 63-74.) On May 21, 2012 the Appeals Council denied plaintiff's request for review, after it received and considered medical evidence dated March 7, 2012, after the ALJ's decision and an earlier decision by the Appeals Council dated March 20, 2012. (Tr. 1-4.) Because the Appeals Council denied the request for review, the decision of the ALJ stands as the final decision of the Commissioner.

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. The Court hereby substitutes Carolyn W. Colvin as defendant in her official capacity. Fed. R. Civ. P. 25(d).

## II. MEDICAL HISTORY

On April 18, 2009, plaintiff complained of back spasms and low back pain. Marcee Stegemeier, APRN-BC, prescribed Indocin and back exercises.[2] (Tr. 223.)

On May 1, 2009, plaintiff arrived at the emergency room and complained of throbbing low back pain that radiated to her legs. The pain began two weeks earlier and gradually increased in severity, despite her recent Voltaren prescription.[3] Kevin O'Roarke, M.D., prescribed her Vicodin, Skelaxin, and Prednisone.[4] He diagnosed low back pain and sciatica.[5] (Tr. 232-39.)

On May 4, 2009, Kaori Sakurai, M.D., recommended a low back MRI and opined that plaintiff might need epidural injections. On May 5, 2009, Dr. Sakurai prescribed Flexeril and Darvocet to replace Skelaxin and Vicodin, respectively.[6] (Tr. 221-22.)

On July 9, 2009, plaintiff received a low back MRI, which revealed posterior disc herniation, moderate spinal canal stenosis, and mild facet joint hypertrophy at L4-L5.[7] (Tr. 229.)

---

[2] Indocin is used to relieve pain, swelling, and joint stiffness caused by arthritis, gout, bursitis, and tendonitis. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013).

[3] Voltaren is used to relieve pain, swelling, and joint stiffness caused by arthritis. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013).

[4] Vicodin is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013). Skelaxin is used to treat muscle spasms or pain. Id. Prednisone is used to treat conditions such as arthritis, blood disorders, breathing problems, severe allergies, skin diseases, cancer, eye problems, and immune system disorders. Id.

[5] Sciatica is pain in the lower back and hip radiating down the back of the thigh into the leg usually caused by a herniated lumbar disk compressing a nerve root. Stedman's Medical Dictionary, 1683-84 (28th ed., Lippincott Williams & Wilkins 2006) ("Stedman").

[6] Flexeril is used short-term to treat muscle spasms. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013). Darvocet is used to relieve mild to moderate pain. Id.

[7] Stenosis is the narrowing of any canal or orifice. Stedman at 1832. Hypertrophy is the general increase in bulk of a part or organ, not due to tumor formation. Id. at 929. The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx). The cervical

On July 16, 2009, plaintiff received a lumbar epidural injection. She rated her pain as 8 of 10 before the injection and 5 of 10 after the injection. (Tr. 216.)

On July 25, 2009, plaintiff arrived at the emergency room and complained of pain in the low back and buttocks that radiated to her legs. She also complained of tingling and numbness in her legs. Kurt Schultz, M.D., diagnosed lumbosacral radiculopathy, spinal stenosis, herniation nucleus pulposus, and low back pain and prescribed Percocet and Motrin.[8] (Tr. 292-300.)

On July 30, 2009, plaintiff reported that her prescriptions and the epidural injection did not improve her pain. Ms. Stegemeier recommended a neurosurgical consultation. (Tr. 218.)

On August 3, 2009, plaintiff received a lumbar epidural fluoroscopy injection. Douglas Curry, M.D., noted no immediate change in plaintiff's symptoms from the procedure. (Tr. 214.)

On August 5, 2009, plaintiff arrived at the emergency room and complained of debilitating pain in her back and legs and numbness in her legs. She was admitted to the hospital and received a neurosurgical consultation from Paul Matz, M.D. Dr. Matz noted plaintiff's use of a walker due to pain and her complaints of burning pain extending into both legs. He suggested an L4-L5 diskectomy but advised that the procedure would relieve solely the leg pain and not her back pain. He also suggested aggressive weight loss. (Tr. 281-82, 286-87.)

On August 10, 2009, Dr. Matz performed bilateral laminotomies, foraminotomies, and diskectomy at L4-L5. He removed a massive fragment that displaced the thecal sac and compressed the underlying nerve.[9] He reported no complications. Plaintiff reported pain improvement and regained her ability to ambulate independently. On August 11, 2009, plaintiff was discharged. (Tr. 274-80.)

---

vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back. The sacrum is immediately below the lumbar vertebrae. Id. at 2117-18.

[8] Radiculopathy is disorder of the spinal nerve roots. Stedman at 1622. Nucleus pulposus is the soft fibrocartilage central portion of the intervertebral disc. Id. at 1343. Percocet and Motrin are used to relieve pain. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013).

[9] The thecal sac is the membrane containing the spinal cord and nerve roots. WebMD, http://www.webmd.com/back-pain/epidural-steroid-injections-for-lumbar-spinal-stenosis (last visited on September 2, 2013).

On August 21, 2009, plaintiff saw Dr. Matz for a follow-up examination. Plaintiff reported leg pain improvement and continued tingling in her legs. Dr. Matz noted that plaintiff was ambulatory and at full strength and opined that longstanding compression of the nerve caused the tingling and that it would eventually improve. (Tr. 317.)

On September 9, 2009, plaintiff arrived at the emergency room and complained of headaches that began two weeks earlier. Plaintiff received a brain CT, which did not reveal any abnormalities. Michael Fritsche, D.O., diagnosed headaches and prescribed Fioricet.[10] (Tr. 257-68.)

On October 2, 2009, plaintiff reported marked improvement regarding her leg pain but slow improvement regarding leg numbness. Dr. Matz found her progress satisfactory. (Tr. 316.)

On October 15, 2009, Joanne Moses submitted a Physical Residual Functional Capacity Assessment form regarding plaintiff. She found that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk about six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. She further found that plaintiff could occasionally climb ramps or stairs, balance, stoop, kneel, crouch, and crawl, but could never climb ladders, ropes, or scaffolds. (Tr. 340-45.)

On October 16, 2009, Kyle DeVore, Ph.D., submitted a Psychiatric Review Technique form regarding plaintiff. He found that plaintiff suffered from depression and that she experienced mild restriction of daily living activities and mild difficulties in maintaining concentration, persistence, and pace. According to Dr. DeVore, the only medical record referencing psychiatrics, dated June 2008, indicated that plaintiff suffered from depression. He noted her Prozac prescription.[11] Although she complained of difficulty with concentration, coping with stress, and exaggerated emotions, Dr. DeVore found her depression well-controlled and her alleged limitations only partially credible. (Tr. 346-56.)

On October 26, 2009, plaintiff complained of back pain and anxiety concerning her finances and back pain. She stated that conflict and stress at home or work aggravated her anxiety and that she experienced fearful thoughts, depressed mood, and panic attacks with

---

[10] Fioricet is used to treat tension headaches. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013).

[11] Prozac is used to treat depression, panic attacks, obsessive compulsive disorder, and bulimia. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013).

increased severity since the onset of her back pain. Kelly Gage, M.D., switched her Prozac prescription with Effexor and recommended counseling for her anxiety.[12] (Tr. 357-58.)

On October 27, 2009, plaintiff complained of a pain flare-up in her back that radiated to her right leg. The flare-up first occurred on October 21, 2009 but had partially subsided. Dr. Matz opined that plaintiff experienced mechanical pain and recommended physical therapy to strengthen her core muscles and a TENS unit.[13] He also recommended X-rays. (Tr. 412.)

On November 20, 2009, plaintiff received an initial evaluation for physical therapy at St John's Mercy Hospital. Plaintiff's goals included improving flexibility, eliminating the numbness and tingling in her lower extremities, and stabilizing her core muscles. (Tr. 421.)

From November 24 to December 30, 2009, plaintiff attended physical therapy on a semiweekly basis. Her physical therapy notes indicate improvement with core stabilization and flexibility and compliance with her home exercise program. On December 4, 2009, plaintiff reported that she began using a TENS unit. (Tr. 422-32.)

On January 13, 2010, plaintiff arrived at the emergency department and complained of abdominal pain. Lisa Oakley, M.D., performed a CT scan on plaintiff's kidneys, ureters, and bladder and opined that she suffered from appendicitis. Dr. Schultz diagnosed acute appendicitis with no perforation. She received an appendectomy. Plaintiff was discharged on January 15, 2010. (Tr. 367-93.)

On January 22, 2009, her physical therapy appointments were put on hold due to her recent appendectomy. On January 29, 2010, plaintiff was discharged from physical therapy because her insurance denied coverage. (Tr. 433-34.)

On January 26, 2010, plaintiff arrived at the emergency room and complained of increased back and leg pain. Leonard Winer, M.D., observed paraspinal low back tenderness and weakness in both lower extremities. Plaintiff requested an MRI. After notification that her neurosurgeon would see her the next day, plaintiff cursed at the head nurse and threatened to commit suicide if she was sent home. The nurse opined that her pain caused her abrasive behavior, and a behavioral health consult found plaintiff not suicidal. (Tr. 393-411.)

---

[12] Effexor is used to treat depression, anxiety, panic attacks, and social anxiety disorder. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013).

[13] TENS, short for transcutaneous electrical nerve stimulation, is a back pain treatment that uses low voltage electric current to relieve pain. WebMD, http://www.webmd.com/back-pain/guide/tens-for-back-pain (last visited on September 2, 2013).

On January 27, 2010, plaintiff complained of back pain that radiated to her buttocks and right leg. She also complained that standing exacerbated her pain. Dr. Matz prescribed Valium and recommended an MRI.[14] (Tr. 416-18.)

On March 5, 2010, plaintiff received an initial evaluation for physical therapy. On March 26, 2010, Jean Stiles, MPT/L, found that plaintiff attained her short term therapy goals except for improving her limited lumbar range of motion and discharged her from therapy. (Tr. 436-40.)

On April 23, 2010, plaintiff reported residual numbness in her calves. She sought more physical therapy sessions pending approval by her insurance and continued physical therapy exercise at home. She also reported long-term problems with depression and anxiety. Edward Chen, M.D., noted that plaintiff suffered from sleep apnea. In 2007 or 2008, she underwent a sleep study and began using a CPAP machine until she lost her insurance.[15] Dr. Chen recommended continued use of the CPAP machine. (Tr. 443-48.)

On June 22, 2010, plaintiff complained of left ankle pain. She reported twisting the ankle several months ago and aggravating the injury three weeks ago. Dr. Chen found nothing significant after examining her left ankle and foot. (Tr. 455-57.)

On August 13, 2010, plaintiff received an initial psychiatric assessment. Rashad Zia, M.D., diagnosed depression and anxiety and gave a GAF score of 48.[16] (Tr. 463-66.)

On August 17, 2010, Jerry Bosse, Ph.D., responded to a request to comment on plaintiff's complaints of various pain-related interferences. Dr. Bosse confirmed that plaintiff had complained of such interferences and reported regularly on the degree of her

---

[14] Valium is used to treat anxiety, acute alcohol withdrawal and seizures. It is also used to relieve muscle spasms and to provide sedation before medical procedures. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013).

[15] A CPAP machine, short for continuous positive airway pressure, helps a person with obstructive sleep apnea breathe more easily during sleep. WebMD, http://www.webmd.com/sleep-disorders/sleep-apnea/continuous-positive-airway-pressure-cpap-for-obstructive-sleep-apnea (last visited on September 2, 2013).

[16] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components.
 A score from 41 to 50 represents serious symptoms (such as thoughts of suicide, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (such as the inability to make friends or keep a job). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 32–34 (4th ed. 2000) ("DSM-IV-TR").

pain. Plaintiff also told Dr. Bosse that she hoped to return to work but could not due to pain. He declined to verify the underlying substance of her complaints but expressed his belief that plaintiff was truthful. (Tr. 468.)

On September 14, 2010, plaintiff complained of left ankle pain. She stated that her surgery caused numbness in her legs and her left ankle caused her to fall on multiple occasions. Mahesh Bagwe, M.D., ordered a left ankle and foot X-ray but found no signs of acute fracture, dislocation, or subluxation. Dr. Bagwe recommended a left ankle MRI and physical therapy to strengthen her lower legs. (Tr. 469-70.)

On September 17, 2010, plaintiff received an MRI on her left ankle, which revealed a deltoid ligament tear and tendonitis. Dr. Bagwe opined that plaintiff suffered from irritation of the sural nerve and recommended anti-inflammation medication, ice, and elevation.[17] (Tr. 469, 472.)

On September 22, 2010, Dr. Zia replaced plaintiff's Celexa prescription with Cymbalta.[18] (Tr. 491.)

On October 4, 2010, plaintiff underwent a nerve conduction study on the peroneal motor nerves, tibial motor nerves, and sural nerves in both legs. She also received a needle electromyography on her muscles in the lumbar paraspinal region and lower legs. Ashok Kumar, M.D., found electrodiagnostic evidence of a left L5-S1 radiculopathy and denervation in the left lumbar paraspinal muscles and lower left leg muscles connected to the L5-S1 nerves. He noted that left tibialis anterior and peroneus longus were the most affected muscles. (Tr. 473-75.)

On November 17, 2010, plaintiff complained that everything bothered her and that she had been snapping at her son, which caused her to become angry with herself. Dr. Zia noted plaintiff's sadness and that she was upset. She also reported her denial of disability benefits. (Tr. 490.)

On December 15, 2010, she reported few episodes of anger and feeling more stable. She also reported that she felt frazzled and overwhelmed. On January 12, 2011, she reported continued improvement with her anger. (Tr. 488-89.)

On March 9, 2011, plaintiff reported feeling more down, angry, and frustrated. She also reported feeling overwhelmed by financial issues, including the loss of her mother's

---

[17] The sural nerve is a nerve in the calf. Stedman at 1872.

[18] Celexa is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013). Cymbalta is used to treat depression and anxiety. Id.

job, denial of disability, and the expiration of her lease term that April. Dr. Zia increased her Cymbalta dosage. (Tr. 487.)

On April 6 and May 4, 2011, plaintiff reported improved anger management and stable mood. On June 29, 2011, plaintiff complained of apprehension and anxiety. She reported that her anxiety caused her to stay in bed and that she felt tired. Dr. Zia prescribed Geodon.[19] On August 24, 2011, plaintiff reported feelings of anger that she could control and no major episodes. Dr. Zia lowered her Geodon dosage. (Tr. 484-86.)

On March 7, 2012, Dr. Chen submitted a Physical Residual Functional Capacity questionnaire regarding plaintiff. He listed her diagnoses as chronic back pain, acute back and sciatic pain, and mental illness, including depression, anxiety, and severe emotional stress. He noted her poor prognosis and that she was not a malingerer. (Tr. 494.)

He found that her symptoms would interfere constantly with the attention and concentration necessary to perform work tasks and that she was incapable of tolerating stress caused by low stress jobs. He also found that she could walk only one block, could sit continuously for only fifteen to thirty minutes, and stand continuously for only fifteen minutes. He further found that she could sit, stand, and walk for less than two hours in an eight-hour workday. He stated that plaintiff needed to walk for five minutes every thirty minutes, required a position that permits shifting positions at will, and required more than ten unscheduled breaks every day. He also stated that she required an assistive device to walk or stand occasionally. (Tr. 495-96.)

Dr. Chen found that plaintiff could lift and carry ten pounds occasionally and twenty pounds rarely but that plaintiff could never carry fifty pounds. He also found that she could occasionally climb stairs and rarely twist and stoop, but that she could never crouch, squat, or climb ladders. He noted that plaintiff's conditions would likely cause absence from work more than four days per month. He concluded that "based on severe back pains and psychiatric/emotional problems, she is unlikely to be successful with meaningful work." (Tr. 496-98.)

**Testimony at the Hearing**

A hearing was conducted before an ALJ on August 2, 2010. (Tr. 15-57.) Plaintiff testified to the following. She never married and is 29 years old. She lives in a two-story townhouse with her mother and her five-year old son. Her mother works from 3:40 p.m. to

---

[19] Geodon is used to treat certain mental or mood disorders. WebMD, http://www.webmd.com/drugs (last visited on September 2, 2013).

2:00 a.m.  She received an associate of arts degree in business management.  She measures five feet, seven inches and weighs 330 pounds.  (Tr. 20-22.)

She last worked in July 2008.  She worked for Orthotic Prosthetic with medical accounts receivable for five years.  Her boss terminated her after an occasion when she emailed her boss and asked to leave work two hours early the next day.  She received tickets to see Barack Obama, which she felt was a once in a lifetime opportunity.  Although she offered to work additional hours, her boss refused because she also requested time off that day for a root canal.  Before that incident, she attended work every day, worked weekends and overtime hours, and brought her son to work.  (Tr. 23-24, 39-41.)

During high school, she worked a part-time summer job at Custom Cut and Tanning as a receptionist.  She scheduled appointments and answered telephones.  She also worked at Six Flags, where she sold tickets and greeted customers.  At Six Flags, she later moved to customer relations.  She left the job to attend college after three months.  (Tr. 24, 27.)

During college, she worked for Sodexo Management, Incorporated.  She worked in the dining hall, where she prepared food and refilled the salad bar.  In May 2003, she completed her degree coursework.  She then worked at Kentucky Fried Chicken at the front counter, where she took and prepared orders and ran the cash register.  Afterwards, she found employment with Comfort Inn as a night auditor.  As a night auditor, her duties included paperwork, greeting guests, preparing breakfast, and laundering towels.  During her time with Orthotic Prosthetic, she worked a second job with Physician's Group, LC, where she also handled accounts receivable.  (Tr. 25-26.)

At the hearing, the ALJ observed that plaintiff had a TENS unit.  Plaintiff testified that Dr. Matz prescribed the unit, and she received the unit in January while undergoing physical therapy.  Her insurance covered the purchase.  She uses her TENS unit at least every day, and her physical therapist told her that the appropriate session length was about thirty minutes.  The unit has settings for the intensity and type of electrical waves it emits.  She wears TENS unit pads on her lower back, and during the hearing, she wore them on her right side.  Her insurance covers the pads, which are necessary to operate the unit on a monthly basis.  (Tr. 28-29, 45.)

She suffers from herniated discs at L4-L5 and, to a lesser extent, at L5-S1.  She underwent back surgery on August 10, 2009.  Her insurance approved sixteen sessions of physical therapy, which she attended from December 2009 to March 2010.  She last underwent an MRI in January 2010.  (Tr. 29-30.)

On April 15, 2009, she felt a sting or pull in her lower back.  Since 2007, similar incidents have occurred every three to six months.  Until April 15, 2009, she continued to work and attended physical therapy.  In 2009, she received less medical attention than in 2007 due to lack of insurance, which delayed her receipt of an MRI.  After the MRI, she received epidural steroid injections and medication, and neither helped her condition.  She received epidural injections on July 15 and August 3, 2009.  (Tr. 41-44.)

On August 5, 2009, she was admitted into Missouri Baptist and underwent surgery on August 10, 2009.  A time lapse between her surgery and physical therapy occurred due to her insurance coverage, but her insurance approved sixteen sessions after consultation with her physicians.  Physical therapy helped but she continues to experience pain and limitations with bending and lifting.  (Tr. 44-45.)

Her physical therapist instructed her on exercises she could perform at home, and plaintiff continues to do them.  Her physical therapist recommended a tolerable amount of walking and aquatic exercises.  She has consulted a nutritionist to facilitate weight loss.  (Tr. 30.)

Her back condition causes problems with her legs and feet.  She often trips due to the numbness in her feet and legs.  Her physicians told her that she suffered from nerve damage.  After her surgery, she could not feel below her waist.  She eventually regained feeling from her waist to her knees.  Her neurosurgeon told her that if she did not regain feeling within one year of surgery, the numbness would be permanent.  The pain and medication during the past year affected her mental stability.  She takes only Ibuprofen to relieve pain.  She has other pain medications but avoids using them because they cause drowsiness.  (Tr. 31-32.)

She experienced memory loss during the prior year.  She cannot spell and sometimes cannot remember words.  Remembering how to divide took her some time, and she currently uses calculators.  Her physicians suggested that her medication and pain cause her memory loss.  She forgets things constantly.  She writes things but later forgets to look at the writing.  She loses focus in the middle of conversation and forgets the topic of conversation.  Recently, she noticed that she could not recall the name of a road that she passed twice per day during the last two years.  (Tr. 32, 49-50.)

Since October 2009, she has taken medication for anxiety and depression, which Dr. Gage prescribed.  In June 2010, she began seeing Dr. Bosse, her psychologist, due to anxiety, stress, and depression and has met with him three times.  Pain and her physical limitations cause her mental conditions.  Specifically, she is unable to go outside to play

with her son, or bathe herself or her son. Dr. Chen, her primary care physician, referred her to Dr. Bosse. She sees Dr. Bosse about twice a month. She scheduled an appointment with a psychiatrist, but cannot recall the date of her appointment because her purse was stolen. (Tr. 33-34, 48-49.)

She does not smoke. She does not drink, but drank Amaretto socially before 2004. She has a driver's license and drives. (Tr. 34-35.)

She applied for social security benefits two weeks after her surgery. When necessary, she drives her son to and from school. Her son attends school in the city about twenty minutes away without traffic, and bus transportation is unavailable. His transportation will be split between her and her mother. She chose a Spanish language immersion school for her son to enable him to learn Spanish. The school does not charge tuition. (Tr. 35-37.)

Folding clothes requires long periods of time due to her need for breaks. She cooks with the microwave. She places dishes in the dishwasher, launders, and vacuums. Although she can perform many household tasks, her mother usually keeps house and can do so at a faster pace. (Tr. 37-38.)

Her son will soon start kindergarten. He previously attended a head start program. She attended his graduation. She shops for groceries and carries light packages. Her son or mother carry heavier package. She can walk for twenty minutes before needing to rest and uses the benches inside Wal-Mart. Before needing to rest, she can stand for twenty minutes and sit from twenty to thirty minutes. She can lift five to ten pounds. Lifting greater weight affects her balance. (Tr. 38-39.)

She can engage in routine household activity for ten to fifteen minutes before she cannot move and needs to lie down. When downstairs, she typically lies in a recliner located on that level because climbing stairs causes her difficulty. She feels unable to lift her feet. Since her surgery, she has fallen on the stairs leading to her bedroom about six times and in public about four times. When upstairs, she lies on her bed. She rests for an hour or more four or five times per day. The duration depends on the severity of pain, and often she is unable to move immediately after lying down. Stormy weather, cold weather, and hot weather affect her back condition. (Tr. 46-47, 50.)

Vocational expert (VE) Deloise Eleanor Gonzales also testified at the hearing. The VE testified that plaintiff worked as a night auditor, which is sedentary, semi-skilled work; accounts receivable clerk, which is sedentary, semi-skilled work; a receptionist, which is sedentary, semi-skilled work; a fast food cashier, which is light, unskilled work; a ticket

selling cashier, which is light, unskilled work; and a salad worker, which is light, semi-skilled work. Considering plaintiff's past work, the VE stated that skills that could be used in other jobs included customer service, math skills, and clerical skills. (Tr. 51-53.)

The ALJ presented a hypothetical question concerning an individual with plaintiff's education, training, and work experience. The individual can perform light work, occasionally climb stairs and ramps, stoop, kneel, and crouch, but can never climb ropes, ladders, or scaffolds or crawl. The individual must avoid concentrated exposure to extreme cold and wetness. The VE responded that such individual could perform all of plaintiff's past work, except for ticket selling because of exposure to wet and cold. (Tr. 53.)

The ALJ altered the hypothetical individual with the requirement of a sit/stand option at the work site with the ability to change position frequently. Regarding plaintiff's past work, the VE responded that such individual could perform only as a cashier, which has 3,479,390 positions nationally, 81,800 in Missouri, and 34,850 in the St. Louis Metropolitan area, although only a quarter of the positions include the sit/stand option. Such individual could also perform as an order caller, which is light, unskilled work with 2,906,600 positions nationally, 77,940 in Missouri, and 35,230 in the St. Louis area. (Tr. 53-54.)

The ALJ altered the hypothetical individual again by limiting the individual to sedentary work. The individual could also understand, remember, and follow at least simple instructions regarding non-detailed tasks, demonstrate adequate judgment to make simple work-related decisions, and perform repetitive work according to set procedures, sequence, and pace. The VE replied that such individual could perform work as an order clerk, which is sedentary, unskilled work with 264,520 positions nationally, 7,130 in Missouri, and 2,540 positions in the St. Louis area, and information clerk, which has 1,112,350 positions nationally, 17,640 in Missouri, and 9,990 in the St. Louis area. (Tr. 54-55.)

The ALJ altered the hypothetical individual a fourth time by requiring three breaks during the workday in addition to the three breaks typically allowed. The VE replied that such individual would be precluded from competitive employment. (Tr. 55.)

Work as an information clerk and order clerk requires attention to detail and being on task in two-hour intervals throughout the workday. An individual experiencing disturbance of the ability to gather and use information for one-third of the day due to pain would be precluded from such work. (Tr. 56.)

### III. DECISION OF THE ALJ

On November 8, 2010, the ALJ issued a decision that plaintiff was not disabled. (Tr. 63-74.) At Step One of the prescribed regulatory decision-making scheme,[20] the ALJ found that plaintiff had not engaged in substantial gainful activity since the alleged onset date, April 15, 2009. At Step Two, the ALJ found that plaintiff's severe impairments were obesity, disorder of the back, and sleep apnea. (Tr. 65.)

At Step Three, the ALJ found that plaintiff had no impairment or combination of impairments that met or was the medical equivalent of an impairment on the Commissioner's list of presumptively disabling impairments. (Tr. 66.)

The ALJ considered the record and found that plaintiff had the residual functional capacity (RFC) to perform light work, except that she required a sit/stand option at the work site allowing her to change position frequently, and she can only occasionally climb ropes and stairs, top, kneel, and crouch, and never climb ropes, ladders, or scaffolds or crawl. She also needs to avoid concentrated exposure to extreme cold and wetness. At Step Four, the ALJ found plaintiff unable to perform any past relevant work. (Tr. 66-72.)

At Step Five, the ALJ found plaintiff capable of performing jobs existing in significant numbers in the national economy. (Tr. 73.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision. Id. As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

---

[20] See below for explanation.

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942. A five-step regulatory framework is used to determine whether an individual is disabled. 20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment. 20 C.F.R. § 404.1520(a)(4)(i)-(iii). If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). Id. § 404.1520(a)(4)(iv). The claimant bears the burden of demonstrating she is no longer able to return to his PRW. Pate-Fires, 564 F.3d at 942. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Id.; 20 C.F.R. § 404.1520(a)(4)(v).

## V. DISCUSSION

Plaintiff argues the ALJ erred in (1) determining plaintiff's RFC; and (2) relying on the VE's response to hypothetical questions that failed to capture the concrete consequences of plaintiff's impairments.

### A. RFC Determination

Plaintiff argues that substantial evidence does not support the RFC determination. Residual functional capacity is the ability of a claimant "to do the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998). Residual functional capacity is a medical determination. Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). Some medical evidence must support the RFC determination. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

The ALJ found plaintiff's allegations concerning the intensity, persistence, and limiting effects of her symptoms not credible. To support this finding, the ALJ noted that

treatment and medication have effectively controlled plaintiff's symptoms. An ALJ may discount a claimant's subjective complaints that are inconsistent with the record as a whole. Van Vickle v. Astrue, 539 F.3d 825, 828 (8th Cir. 2008).

After her August 2009 surgery, plaintiff reported pain improvement and regained the ability to walk after physical therapy. (Tr. 317.) She reported marked improvement with leg pain, and Dr. Matz found her progress satisfactory. (Tr. 316.) She told Dr. Chen that she continued to perform physical therapy exercises at home and that she found them helpful. (Tr. 443.) Dr. Chen noted that her anxiety and depression symptoms were stable and that plaintiff had never before met with a psychiatrist or counselor, although she later saw a psychiatrist. (Tr. 444, 455.) She also told Dr. Chen that her back pain had improved since her surgery, and that she rarely used pain medications other than Ibuprofen. (Id.) See Baker v. Barnhart, 457 F.3d 882, 893 (2006) (finding a claimant's choice to not take pain medication a valid factor for discrediting subjective pain complaints).

The ALJ stated that plaintiff testified that she received unemployment benefits after her alleged onset date and determined that statements made in applying for such benefits further undermined her credibility. Plaintiff's alleged onset date is April 14, 2009, and the record indicates that plaintiff last received unemployment benefits during the first quarter of 2009. (Tr. 147, 151, 160-63.) Although the ALJ and plaintiff briefly discussed unemployment benefits, plaintiff never testified in the manner described by the ALJ. (See Tr. 23.) Although the ALJ erred in relying on the application for unemployment benefits, the aforementioned inconsistencies in the record sufficiently support the ALJ's decision to discount plaintiff's allegations.

The ALJ also relied on opinions of non-examining sources. "[A]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." Casey v. Astrue, 503 F.3d 687, 691-92 (8th Cir. 2007). Notably, the opinion of Dr. Chen submitted after the ALJ's decision is the sole opinion in the record of any treating physician regarding the limitations caused by plaintiff's impairments. The evidence discussed above is also consistent with the opinions of the non-examining sources, and the ALJ properly cited the opinions in support of his decision.

Plaintiff next argues that the opinion of Dr. Chen, her treating physician, is entitled to controlling weight. In declining review of the ALJ's decision, the Appeals Council considered Dr. Chen's opinion, which plaintiff submitted after the ALJ's hearing. (Tr. 1-4, 494-48.) When a claimant submits evidence after the ALJ hearing that is considered by the

- 15 -

Appeals Council, such evidence is included in the record. Bergmann v. Apfel, 207 F.3d 1065, 1068 (8th Cir. 2000). The court must determine whether the ALJ's decision is supported by substantial evidence in the record including the evidence submitted after the ALJ issued his decision. Id. "In practice, this requires this court to decide how the ALJ would have weighed the new evidence had it existed at the initial hearing." Id.

"[A]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Wildman v. Astrue, 596 F.3d 959, 964 (8th Cir. 2010). The Commissioner argues and the Appeals Council determined that Dr. Chen's opinion is inconsistent with his treatment notes. In his opinion, Dr. Chen found that plaintiff's symptoms would interfere constantly with her attention and concentration and noted her lower tolerance for stress. (Tr. 495.) He also found that she could walk, stand, and sit for very limited amounts of time and required over ten breaks per day. (Tr. 495-97.) However, as discussed above, Dr. Chen noted plaintiff's pain improvement, rare use of pain medication, and stable anxiety and depression symptoms. (Tr. 443-44, 455.) Accordingly, the undersigned finds that the ALJ would have discounted Dr. Chen's opinion by finding it inconsistent with the record as a whole.

Plaintiff further maintains that the ALJ failed to cite medical evidence and that substantial evidence does not support the RFC determination. However, the evidence that supports discounting plaintiff's allegations and Dr. Chen's opinion discussed above also supports the ALJ's determination of plaintiff's RFC. See Brown v. Astrue, 611 F.3d 941, 955 (8th Cir. 2010) ("If an impairment can be controlled by treatment or medication, it cannot be considered disabling."). Additionally, the ALJ provided detailed discussion of other aspects of plaintiff's medical history, including her trips to the emergency room and records from her treating physicians. (Tr. 67-70.) In conclusion, substantial evidence supports the RFC determination.

**B. Hypothetical question**

Plaintiff argues that the ALJ erred by relying on the VE's response to hypothetical questions that failed to capture the concrete consequences of plaintiff's impairments. Testimony based on hypothetical questions that do not encompass all relevant impairments cannot constitute substantial evidence to support the ALJ's decision. Hillier v. Social Sec. Admin., 486 F.3d 359, 366 (8th Cir. 2007). Hypothetical questions should set forth

impairments supported by substantial evidence on the record and accepted as true and capture the 'concrete consequences' of those impairments.  Id.

In the ALJ opinion, the ALJ relies on VE testimony given as a response to the ALJ's hypothetical questions. (Tr. 73.) The hypothetical questions involved an individual with an RFC that the ALJ later found to be plaintiff's RFC. (Tr. 53-54, 66.) Specifically, plaintiff argues that because substantial evidence did not support the RFC determination, the hypothetical questions encapsulating that determination failed to capture the concrete consequences of plaintiff's impairments. However, as discussed above, substantial evidence supports the RFC determination. Accordingly, the ALJ did not err by relying on the VE's response to hypothetical questions.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed.  An appropriate Judgment Order is issued herewith.

  /S/   David D. Noce  
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 3, 2013.